IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER THIRTEEN |
| STEVEN S. BOCCHINO, | : | BANKRUPTCY NO.: 5-09-bk-01494-JJT |
| DEBTOR | : | |
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | {**Nature of Proceeding**: Complaint to Determine Nondischargeability of Debt} |
| PLAINTIFF | : | |
| vs. | : | |
| STEVEN S. BOCCHINO, | : | |
| DEFENDANT | : | **ADVERSARY NO.: 5-09-ap-00267-JJT** |

# OPINION

The Plaintiff, United States Securities and Exchange Commission, (SEC), has filed a Complaint objecting to the dischargeabililty of a certain debt by the Chapter 13 Debtor, Steven S. Bocchino, (Debtor/Bocchino), under § 523(a)(2) and § 1328(a)(2) of the Bankruptcy Code.[1]

Bocchino was a registered representative or, as commonly referred to, a stockbroker. Transcript of 01/23/2013 at 27, Doc. #48. As such, he sold private placements of an interest in an entity known as "Traderz" and stock in Fargo Holding Company. He sold these interests to a group of individuals that he referred to as clients with the pitch that there was much money to be gained by these investments. In advancing these sales, Bocchino made various statements, none of which, according to him, he thought were untrue.

---

[1] Had this case been one under Chapter 7, no doubt the Plaintiff would have complained under 11 U.S.C. § 523(a)(19), a provision aimed at violations of securities law. The discharge of this type of debt under the broader discharge provisions of Chapter 13 render this option unavailable.

The Complaint alleges that Bocchino, and others, were named as Defendants in two civil suits initiated by the SEC in Federal District Court. The final judgment in the first litigation (Goldman action dealing with Traderz) resulted in Bocchino being directed to pay $84,959.70 which included $35,090 in disgorgement, $14,779.70 in prejudgment interest, and $35,090 in civil penalties payable to the SEC. The second action (Nnebe action dealing with Fargo) resulted in Bocchino being ordered to pay $94,007.85 including $14,800 in disgorgement, $4,207.85 in interest, and a civil penalty of $75,000 payable to the SEC. The SEC has unsuccessfully argued that these cases should dispose of the issues in this dischargeability action by virtue of collateral estoppel. I declined to so rule inasmuch as both judgments occurred as a result of default judgments and, under the circumstances under which default occurred, do not bar the Debtor from presenting a defense. See Opinion and Order dated October 25, 2012, Doc. #35 and #36.

Section 532(a)(2) (A) states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt– . . .(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

After trial at which Bocchino and one other testified, and after review of all exhibits including various depositions, it is fairly clear that Bocchino did not knowingly make any false statements. That fact, however, may not be enough to allow Bocchino to escape liability on the Complaint. While a false representation normally requires a "scienter" such that statements are made with intent to mislead, a less stringent requirement of recklessness may be seen as sufficient to replace scienter in case of stockbroker sales. *In re White*, 128 Fed.Appx. 994, at 7

(4th Cir. 2005) (Unpublished opinion).

An investment adviser is a fiduciary. *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 194, 84 S.Ct. 275, 284 (1963).

> Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients. There has also been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue. The 1909 New York case of *Ridgely v. Keene*, 134 App.Div. 647, 119 N.Y.S. 451, illustrates this continuing development. An investment adviser who, like respondents, published an investment advisory service, agreed, for compensation, to influence his clients to buy shares in a certain security. He did not disclose the agreement to his client but sought 'to excuse his conduct by asserting that . . . he honestly believed, that his subscribers would profit by his advice . . . .' The court, holding that 'his belief in the soundness of his advice is wholly immaterial,' declared the act in question 'a palpable fraud.'(footnotes omitted)

*Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 194-195, 84 S.Ct. 275, 284 (1963).

Despite its age, *Capital Gains Research* still stands as precedent for a description of an investment adviser's duties. *Belmont v. MB Inv. Partners, Inc.* 708 F.3d 470, 503 (3rd Cir. 2013). In the absence of outright criminal conduct, a deviation from these duties can take place over a continuous spectrum described as ranging from mere negligence to gross recklessness. As the Debtor's conduct approaches gross recklessness, the necessity of finding scienter or guilty knowledge on the part of the Debtor dissipates. Look, for example, at the Restatement of Torts, 2nd at § 526, which states:

> § 526 Conditions Under Which Misrepresentation Is Fraudulent (Scienter)
> A misrepresentation is fraudulent if the maker
> (a) knows or believes that the matter is not as he represents it to be,
> (b) does not have the confidence in the accuracy of his representation that he states or implies, or
> (c) knows that he does not have the basis for his representation that

he states or implies.

REST 2d TORTS § 526.

It should be fairly obvious that, if a stockbroker makes up facts in order to convince an investor to put money into a company, guilty knowledge or scienter is present. Given the required responsibility placed on this function, it should be just as clear that a stockbroker's investigation in an investment could be significant, yet negligently performed. In this case, there may be liability but the attributes of scienter would not be present. What I suggest is that there is present this vast range of conduct that falls between these last two categories of conduct where a stockbroker could be so careless that little effort is invested in researching the quality of a customer's investment, and the law would equate this reckless conduct to scienter. While I have some difficulty enunciating the exact parameters of such conduct that would equate to scienter, reference has been made to the "robust body of securities law examining what these terms mean." *In re Hyman,* 502 F.3d 61, 69 (2nd Cir. 2007). Some guidance can be found in the recent United States Supreme Court case of *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754 (2013). *Bullock* arose in the context of an examination of the standards needed when determining whether defalcation could result in a determination of nondischargeability under § 523(a)(4). Nevertheless, the Court's discussion of the required elements where "actual knowledge of wrongdoing is lacking" is insightful.

> We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must

> be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added).

*Bullock v. BankChampaign, N.A.,* 133 S.Ct. 1754, 1759-1760 (2013).

The failure of an investment adviser to do any real investigation into a security characterizes recklessness. *In re White*, 128 Fed.Appx. 994, 1001 (4th Cir. 2005) (Unpublished opinion). The failure to investigate is a dereliction of a known duty of a registered representative. *Hanly v. Securities and Exchange Commission*, 415 F.2d 589, 595 (2nd Cir. 1969).

With this background, an examination of the current record demonstrates that the Debtor, Bocchino, was a stockbroker/general securities representative in the mid 1990s on behalf of nine different brokerage firms over Bocchino's brokerage career. In 1996, his then boss at M. A. Gillespie alerted him to a private offering of a company known as Traderz Associates Holding, Inc. that might go public and had secured some commitment with a then popular model known as Niki Taylor. The superior, an underwriter named Americo "Ricky" Gallo, advised Bocchino that he would receive a commission on funds he secured from his clients for this purpose. Before any specific review of the support for such an investment, Bocchino immediately contacted his client base and began soliciting investments from them. At that point, he made no investigation of whether Traderz was incorporated, had bank accounts, or even had an office. He did nothing except rely on Gallo, Bocchino's superior at M. A. Guilespie.

In similar fashion, Bocchino sold stock in Fargo Holding Company based on a similar "tip" received from an associate, Daniel Coyle. Transcript of 01/23/2013 at 48, Doc. #48. Bocchino testified that he did receive some "documentation" from Coyle and met a day trader

[K:\Cathy\Opinions-Orders filed 2013\5-09-bk-00267-JJT_Bocchino.pdf]        5

Case 5:09-ap-00267-JJT    Doc 57    Filed 12/23/13    Entered 12/23/13 13:13:55    Desc
                          Main Document      Page 5 of 8

associated with Fargo before initiating his sales effort.[2] Transcript of 01/23/2013 at 69, Doc. #48. No other follow up by Bocchino took place, and a significant amount of monies were received from Bocchino's clients in this endeavor. In return for these sales, Coyle paid a cash commission to Bocchino. Transcript of 01/23/2013 at 52, Doc. #48. Only after receiving information that such an investment might not be valid did Bocchino begin an investigation into whether Fargo Holding was a worthwhile endeavor.

For the most part, Bocchino defends his actions by saying he relied on others in soliciting the sales of these subscriptions and stock. Case law is replete with support that reliance on superiors does not absolve the stockbroker from the responsibility to do independent research. *Graham v. S.E.C.*, 222 F.3d 994, 1006 (D.C. Cir. 2000). Bocchino argues that his clients were sophisticated investors who understood the risks in the subscriptions and the stock that were sold. Case law is clear that this is no excuse for failing to perform an appropriate investigation into the sale the broker is advancing. *Hanly v. Securities and Exchange Commission*, 415 F.2d 589, 596 (2nd Cir. 1969).

In defending his actions regarding the so-called private placement of Traderz subscriptions, the Debtor argues that because Traderz was not yet incorporated, there was little financial backup to examine prior to his solicitations. The defense rings hollow. The lack of a corporate entity renders all the more important that the proposed capital structure of the new entity be evaluated in some fashion by the broker. For example, contracts with potential principals could have been reviewed; inquiry could have been made as to the capital contribution

---

[2] The testimony is somewhat conflicting since Bocchino had also testified that he did not meet the day trader, Ted Betios, prior to selling Fargo stock. Transcript of 01/23/2013 at 50, Doc. #48.

committed to the project; verification that invested funds would be maintained and disbursed appropriately; and confirmation that the principals have the wherewithal, financially and experience-wise, to accomplish the goals of the organization.  These identify but a few of the steps a broker could have taken before advancing the product being traded.  So little was done by Bocchino that the Court has no trouble calling his conduct extremely and recklessly indifferent to the responsibilities borne by him as an investment adviser.

      The facts are even more compelling in the Fargo Holding saga.  Here, an existing corporation was never evaluated financially before stock was sold on second and third hand information relayed by a non-principal from the company principal whose full-time "job" was law student.  The circumstances are egregious and fully compel the same finding of grossly reckless conduct for Debtor's own greedy purpose, i.e., commissions.

      In advancing sales of the type described, Bocchino clearly went far awry of the standards required of him as an investment adviser.  Not only was this negligent, but extremely reckless.  As an experienced stockbroker, he knew, or should have known, that an independent investigation into the quality of the product he was selling was imperative.  It would have been the minimum that would have been expected by his clients who trusted him with significant sums of money.  I find that the SEC has met its burden of establishing the nondischargeability of sums assessed as the disgorgement portion of the judgments heretofore entered against Bocchino in District Court.

      With that said, I turn my attention to those portions of the existing judgments that are attributed to interest and civil penalties.  In determining the dischargeability of these items, I first look to the statute where I find that debts for civil penalties payable to a governmental unit are

specifically set forth in the nondischargeability section of § 523(a)(7). Having stated that, however, debts under § 523(a)(7) *are* dischargeable under the superdischarge provisions of § 1328(a), and so the SEC's Complaint must fail in this regard.

As to the interest component of the District Court judgments, interest assessments that are ancillary to a nondischargeable debt are, too, nondischargeable. *In re Niles*, 106 F.3d 1456, 1463, (9th Cir. 1997), *Matter of Jordan*, 927 F.2d 221, 228 (5th Cir. 1991). Accordingly, the interest awarded on the judgments shall also be deemed nondischargeable under Chapter 13.

My Order will follow.

By the Court,

Date: December 23, 2013

John J. Thomas, Bankruptcy Judge
(CMS)